544 So.2d 675 (1989)
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION & DEVELOPMENT, Plaintiff-Appellant,
v.
Roger DIETRICH, et al., Defendants-Appellees.
No. 88-276.
Court of Appeal of Louisiana, Third Circuit.
May 24, 1989.
Bertrand & Soileau, Ronald J. Bertrand, Rayne, for plaintiff-appellant.
Kelly & Salim, Robert L. Salim, Natchitoches, for defendants-appellees.
Before FORET, YELVERTON and KING, JJ.
YELVERTON, Judge.
This is an appeal by the state from a jury award of $405,600 granted as an economic loss to landowners as a result of the taking by expropriation of certain of their property for the construction of I-49 in Natchitoches Parish. For reasons which follow, we reverse the award for economic loss, as well as an award of $54,954, also appealed, which the jury gave as a "cost to cure" and which the landowners concede on this appeal was a duplication. As a result of the elimination of these awards, we will also reduce attorneys fees. We leave untouched the award of expert witness fees.
*676 Leonard Melvin Dietrich and his son, Roger Dietrich, bought a 365.19 acre tract of land in Natchitoches Parish in 1980 for the purpose of raising cattle for sale and also for slaughter in their slaughterhouse business, a business which was located on another piece of property.
In 1983 the state expropriated 43.74 acres of this tract for the construction of Interstate Highway 49. The expropriated acreage sliced through the middle of the tract leaving 140.6 acres on one side and 180.85 acres on the other. The jury awarded $53,305 as the full value of the 43.74 acres taken in the expropriation, and it awarded $132,569 in severance damages, largely because the 180.85 acre tract would have accessibility problems during certain times of the year. The state does not appeal these two awards.
As its third itemized award, the jury gave the landowners $54,954 as a "cost to cure". The state appeals this award, but since the landowners have conceded in brief that this award is a duplication of an amount already considered by the jury in the award of severance damages, we reverse it without further comment.
The essential dispute that is before us now, and what the state vigorously contests, is the additional award of $405,600 that the jury gave as an economic loss, both past and future.
We find that an economic loss award in this case is not supported by the law or the facts. We note at the outset that the jury was instructed in the charges, and also by means of the verdict sheet and its list of compensation items, to consider economic loss, both past and future, in its assessment of just compensation, but nowhere in the jury charges did the trial court ever define for the jury what an economic loss was, how it was to be calculated, under what conditions it was to be considered, and how and under what circumstances such an award differs from severance damages. The jury was left to its own resources in the determination of an award for economic loss.
Finding the basis for this award, however, is not too difficult to locate in the testimony. The record shows that Leonard Dietrich owned a slaughterhouse which he and his son, Roger, operated. In 1980 the two Dietrichs bought the 365.19 acre tract in another location in the parish to raise cattle for sale on the open market and also in conjunction with the slaughterhouse operation. The landowners testified that they ran roughly 150 mama cows on the property prior to the expropriation, using them to raise calves. The steer calves were sold through the auction and the heifer calves were processed through the slaughterhouse. There was testimony that the herd produced about 85 calves per year.
To prove the nature and dollar amount of their purported economic loss, the landowners relied on the testimony of a certified public accountant, David Waskom, and an economist, Dr. Earl Thames. The basis of their claim for economic loss was the assertion that the Dietrichs could no longer run 150 head of cattle on the two remaining tracts after the expropriation. In vague testimony, the CPA testified that the Dietrichs made 15¢ per pound more on the cattle which they raised and processed through their slaughterhouse than on beef which they had to purchase. Using the 15¢ per pound figure and an average of 85 calves per year, the CPA calculated that because of the expropriation the Dietrichs had lost $9,605 per year in revenue up until trial, and would lose that much every year in the future.
In his testimony the economist, Dr. Thames, added $11,700 per year in lost revenue. This figure was the result of his calculation that 130 calves a year were produced, that they gained 150 pounds each year, and that at 60¢ a pound, this resulted in $11,700 a year. To this $11,700 he added the $9,605 savings testified to by the CPA that the Dietrichs made in their slaughterhouse by processing their own beef.
Armed with the figure of $21,305 a year, the economist then calculated that from the time of the taking until the trial the Dietrichs had suffered an economic loss of $99,145. The jury itemized for past economic loss the amount of $99,600, unquestionably *677 relying on the testimony of Mr. Waskom and Dr. Thames.
In further testimony Dr. Thames mathematically projected these losses for 39 years after the trial. He used 39 years because Roger Dietrich, the younger of the father and son team, was 22 years old and 39 years would elapse before he would reach the age of 65. Projecting future economic loss, Dr. Thames simply multiplied 39 times $21,305, for a future economic loss of $830,895. He conceded on cross-examination that this figure should be reduced by 38% because the Dietrichs could still run 50 cows on their remaining land and his calculations had been based on no cattle at all. The jury, to their credit, made a further reduction and came up with $306,000 as the amount of the award for future economic loss. The total award for economic loss, $405,600, was in addition to the award of $53,305 for the land taken and $132,569 in severance damages.
In ruling that the awards for economic loss have no basis in law or in fact as applied to this case, we pretermit any discussion of the legal or logical validity of approaching a calculation of the loss on the basis of the younger Dietrich's work-life expectancy. We pretermit also whether it is proper to calculate economic loss resulting from an expropriation on the basis of the effect on an entirely different business enterprise of the landowner situated outside the expropriated area and unaffected by the expropriation itself. The basis on which we decide this case is that the Dietrichs were compensated to the full extent of their loss by the awards of the value of the property taken and the award of severance damages, and that any further losses claimed in this case as resulting from the expropriation simply do not qualify under our law and jurisprudence as falling within the definition of what is meant by "full extent of the loss".
Article 1, Section 4, of the Louisiana Constitution, 1974, provides that a landowner in an expropriation case shall be compensated to the full extent of his loss. Thus, the landowner must be paid not only the market value of the property taken and severance damages to the remainder, but also whatever amount is required to put him in as good a position pecuniarily as he would have been had his property not been taken. State, through Department of Highways v. Constant, 369 So.2d 699 (La. 1979). The Constant case is the benchmark case for ascertaining what is meant by the term "to the full extent of the loss". That case involved the expropriation of property owned and used by marina operators as a loading and parking area. Although the parent tract of land constituting the major marina operations remained intact, the court found that the tract taken would substantially destroy the marina business unless the loading and parking areas were replaced. The court held that compensating the owners required paying them the replacement costs of the expropriated areas without a deduction for depreciation, in order to compensate them to the full extent of their loss.
The court's holding in Constant was strictly premised upon "the circumstances and the nature of the property taken". The property in Constant was both unique in nature and location and also indispensable to the conduct of the landowner's business operations on the site from which a part was taken.
That is not the case before us. The Dietrichs in the present case made no showing that the 365.19 acre tract affected by the expropriation was the only place in Natchitoches Parish within reasonable relationship to their slaughterhouse suitable for raising cattle. The 365.19 acre tract was not unique in any sense, such that its partial loss would require compensation by a measure different from the usual standards of market value for the property taken plus severance damages for the remainder.
In Central Louisiana Electric Co. v. Huckabay, 446 So.2d 1327 (La.App. 2d Cir. 1984), writ denied 450 So.2d 361 (La.1984), the court rejected an award of both severance damages and additional farming expenses made necessary by the expropriation of servitudes for electric transmission lines. The farmers urged that they had *678 suffered an economic loss and the trial court agreed, awarding them both severance damages and additional farming expenses for the next 10 years. The appellate court reversed the economic loss award, reasoning that the award was in effect a "cost to cure" damage award, and that the case was not a unique case requiring such an award over and above diminution in market value to the remainder. See also State, DOTD v. Crawford Business Trusts, 538 So.2d 1078 (La.App. 3rd Cir. 1989).
Inasmuch as there was nothing unique about the 365.19 acre tract, such that the full extent of the owners' loss required measurement by some means other than value of the land taken plus severance damages, we hold that the landowners were not entitled to the jury awards for economic loss herein.
The state claims that the attorney's fee award of 25% of the increase was excessive. Pursuant to La.R.S. 48:453, the trial court awarded attorney's fees to the defendants in the amount of 25% of the difference between the increased award and the deposit in the registry of court at the time of the taking. We find no abuse of discretion in fixing this fee at 25%.
Finally, the state complains of the amount of the award of expert witness fees, particularly the fee of $24,950.03 fixed and taxed as costs on behalf of the expert E.J. Giering, III, for engineering services.
The assessment of witness fees was discussed in the matter of State, DOTD v. Jacob, 491 So.2d 138 (La.App. 3rd Cir.1986), writ den. 496 So.2d 331 (La.1986), where the court stated:
In expropriation proceedings, the condemning authority is taxed with the reasonable costs of the testifying expert witness retained by the landowner to assist him in obtaining his just compensation. State of Louisiana, through the Department of Highways v. William T. Burton Industries, Inc., 219 So.2d 837 (La.App. 3rd Cir.1969), writ refused, 254 La. 14, 222 So.2d 67 (La.1969).
The fixing of expert witness fees is largely within the sound discretion of the trial court, and the trial court's fixing thereof will not be disturbed on appeal in the absence of abuse of discretion. State of Louisiana, Through the Department of Highways v. Salles, 387 So.2d 1278 (La.App. 1st Cir.1980), writ denied, 393 So.2d 744 (La.1980); State of Louisiana, Department of Transportation and Development v. Van Willet, 389 So.2d 1346 (La.App. 3rd Cir.1980).
In fixing expert witness fees, each case must turn on its own peculiar facts and circumstances. However, the jurisprudence has provided us with certain factors to consider in fixing expert witness fees. Some of the pertinent factors are the amount of time consumed by the experts in compiling their reports; the amount charged the landowner; the amount of time spent in preparing for trial; the amount of time actually spent in court; the expertise of the expert; the difficulty of the appraisal; the amount involved in the award; and, the degree to which the expert's opinion aided the court in its decision. State of Louisiana, Through the Department of Highways v. Romano, 343 So.2d 222 (La.App. 1st Cir.1977).
Mr. Giering did surveys and engineering work to determine the cost to cure the severance damage due to the construction of I-49 across the landowners' property. He worked up costs on five potential access routes, concluding that such costs ranged from $48,543 to $161,265. In his report and in his testimony he selected the $48,543 route as the least expensive and recommended that the state be required to compensate the Dietrichs that amount to restore access to the property severed on the west side. In addition, he testified that the cost of correcting two drainage problems would total $6,411. These figures added to $54,954, which is exactly what the jury awarded as the "cost to cure" item on the verdict sheet. The evidence shows that other experts testifying as to severance damages utilized the report of Giering in their calculations. The award by the jury of severance damages totaling $132,569, *679 included Giering's "cost to cure" figure, a fact conceded by the landowners in their brief to this court. The reason we make these observations is to point out that Giering's testimony was useful to the jury in calculating the considerable increase (from $1,383 to $132,569) in severance damages awarded to the landowners over what the state had deposited at the time of the taking. Accordingly, Giering's work and his testimony figured prominently in the increase in the award.
Giering's charges were presented to the landowners in two invoices, one for $4,045 representing surveying work, and the other for $20,905.03 representing engineering services, some topographic survey services, and testimony in court. These invoices reflected 164 hours of engineering time and 186 hours of drafting time.
During cross-examination by the state, Giering was questioned only about the $4,045 invoice. He testified that his survey resulted in the discovery that 40 acres of the landowners' property had been left out by the state in its calculations. It cannot be disputed that this survey was important to the case and there is no indication that the amount charged was excessive.
The necessity for the extensive services reflected by the $20,905.03 bill perhaps was subject to question, but we note that during the testimony the state failed to cross-examine Giering at all concerning the work reflected by the larger invoice. Since there was no attack made on the necessity for that invoice during his testimony, we have to assume that the services were required and that they were legitimately related to the development of the lawsuit. The trial judge thought so and we have no basis to conclude otherwise. For these reasons we find no abuse of discretion in the trial court's fixing of the expert witness fees.
For the reasons assigned above, the judgment of the trial court awarding $53,305 for the property expropriated, and awarding $132,569 for severance damages is affirmed; the judgment, insofar as it awards "cost to cure" damages, $54,954, and economic losses, $405,600, is reversed; the award of attorney's fees of 25% of the amount of the final award in excess of $45,700 is affirmed; and the award of expert witness fees is affirmed. Costs on appeal are assessed at $193.06 to the DOTD and $579.19 to the landowners.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART.